UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

Christine M. Nordgren,                              Case No. 21-CV-125 (JRT/TNL)

        Plaintiff,

vs.

Hennepin County Hennepin County
Department of Human Services and Public
Health, David J. Hough, Hennepin County
Administrator, Jodi Wentland, Hennepin County
Director of Human Services, Joan Granger-Kopesky,
Director of Hennepin County Child and Family Services,
Mary Kay Libra, Hennepin County Child and Family
Services Social Worker, Jodi Harpstead, Commissioner,
Minnesota Department of Human Services,
Michael O. Freeman, Hennepin County Attorney,
Katy L. Stesniak, Assistant Hennepin County Attorney,
Nystrom & Associates, Ltd., Rochelle Anderson,
Craig Rice, Susan Vinge,

        Defendants.

---

**DEFENDANTS NYSTROM & ASSOCIATES, LTD.,
ROCHELLE ANDERSON, AND SUZANNE VINGE'S
MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR
JUDGMENT ON THE PLEADINGS UNDER
FED. R. CIV. P. 12(c)**

---

## INTRODUCTION

This action follows a Minnesota state court's order terminating Plaintiff Christine Nordgren's parental rights, which came after two years of attempting to make progress toward unifying Plaintiff with her children. Defendants Nystrom & Associates, Ltd.,

Rochelle Anderson, and Suzanne[1] Vinge[2] provided therapy services to Plaintiff's children, assessed the family's readiness for family therapy, and advised the state court about the status of family therapy and the children's best interests. For reasons related to Plaintiff's unwillingness to apologize for hurting the children, which impacted whether the children could feel safe participating in family therapy with her, Nystrom never provided family therapy services.

Plaintiff now brings this lawsuit alleging claims against nearly every party involved in the state court proceedings. But her complaint is barred by the *Rooker-Feldman* doctrine, and it fails to plausibly allege facts that could lead this Court to conclude that Nystrom is liable for the damages Plaintiff alleges in the four claims she asserts against it. Accordingly, Nystrom moves for judgment on the pleadings and respectfully asks this Court to dismiss Plaintiff's claims against it in their entirety.

## DOCUMENTS COMPRISING THE RECORD

ECF 9:      Plaintiff's First Amended Complaint (cited herein as FAC)

ECF 42:    Joint and Separate Answer of Defendants Nystrom & Associates, Ltd., Rochelle Anderson, and Suzanne Vinge's to Plaintiff's First Amended Complaint

ECF 47:    Findings of Fact, Conclusions of Law and Order for Termination of Parental Rights dated October 23, 2017 (Exhibit 1 to the Declaration of Caroline H. Brunkow)

ECF 72:    Order for CHIPS Adjudication and Foster Placement dated October 9, 2015 (Exhibit B to the Declaration of May Yang)

## STATEMENT OF FACTS

---

[1] The FAC incorrectly identifies Suzanne Vinge as "Susan."

[2] Defendants Nystrom & Associates, Ltd., Rochelle Anderson, and Suzanne Vinge are all represented by the undersigned. This memorandum refers to these three defendants collectively as "Nystrom" unless otherwise noted.

Nystrom & Associates provides mental healthcare, including individual psychiatry and psychology services, family therapy services, clinical social work services, and other related services. Rochelle Anderson and Suzanne Vinge were employees of Nystrom & Associates. This matter arises out child-protection proceedings involving Plaintiff and her children beginning in 2015 and continuing through October 2017—in which Nystrom had limited involvement providing therapy services for the children and advising the state court on the children's best interests with regard to terminating Plaintiff's parental rights—and the damages Plaintiff alleges arose from the eventual termination of her parental rights. (*See generally* FAC).

## I.    The child protection action in Minnesota state court[3]

On August 25, 2015, a petition was filed in the Juvenile Division of Hennepin County District Court asserting that Plaintiff's two children were in need of protection or services. (*Id.* at ¶ 64; ECF 47 § 8.1). On October 9, 2015, the children were adjudicated in need of protection or services; Plaintiff admitted to leaving the children alone overnight without supervision and the children were not mature enough to be left alone. (FAC at ¶ 64; ECF 47 § 8.2). The state court ordered that custody of Plaintiff's children be transferred to Hennepin County Human Services and Public Health Department (the Department). (ECF 47 § 18.0). Plaintiff was ordered to comply with a case plan, which set forth a number of

---

[3] The Hennepin County Defendants' Motion to Dismiss provides a broader summary of the child protection action, whereas Nystrom's factual summary focuses on its own limited involvement in that action. (*See* ECF 45 p. 3-6). Nystrom incorporates those facts summarizing the state court matter and Plaintiff's appeal therefrom.

requirements including that Plaintiff "[p]articipate in [the] children's therapy as recommended by their therapist, including family therapy." (*Id.* at § 18.5).

Through the Department, Nystrom provided therapeutic services to Plaintiff's children. (*Id.* at § 23.2). The Nystrom care team included Anderson, Defendant Craig Rice, and their supervisor, Vinge. (*Id.*) Nystrom's goal was to establish contact between the children and Plaintiff and to reunify the family, if such reunification was in the children's best interests. (*Id.* at §§ 20.1, 23.0).

Nystrom did not provide therapy services to Plaintiff. Instead, in accordance with Plaintiff's court-ordered case plan to participate in the children's therapy as recommended by the children's therapist, Anderson periodically met with Plaintiff to determine whether Plaintiff was ready to participate in family therapy with her children. (*Id.* at § 23.1-.2). Anderson met with Plaintiff intermittently between May 2016 and March 2017. (*Id.* at § 23.5). Anderson reported to the Department that, to effectuate the therapeutic goals of healing within family therapy, Plaintiff's children needed to feel safe with her. (*Id.* at § 23.3). Anderson's opinion was that, as part of helping the children feel safe, Plaintiff needed to take responsibility for her past actions that had hurt the children and to apologize to the children. (*Id.*). Plaintiff repeatedly failed to do so. (*Id.* at §§ 23.3-.6). Ultimately, Nystrom recommended that the no-contact order remain in place because the children did not feel safe with Plaintiff; Plaintiff and the children never engaged in family therapy because it never became in the children's best interests. (*Id.* at § 23.3–.5, 25.1–25.4).

The state court held a multiple-day trial regarding the termination of Plaintiff's parental rights in 2017. (*See generally* ECF 47). Plaintiff was represented by counsel during

these proceedings. (*Id*. at Appearances). On October 23, 2017, the state court terminated Plaintiff's parental rights. (*Id*. at Order). It had concluded that such termination was in the best interest of the children, and issued extensive findings and conclusions supporting the order for termination. (*See generally* ECF 47).

## II.    This action

More than three years later, Plaintiff commenced this action—which names nearly every person, department, and entity involved in the child-protection matter—in federal court. Plaintiff generally contends that the defendants' past actions caused her damages, namely the termination of her parental rights and other damages stemming therefrom. (*See generally* FAC). Plaintiff's FAC sets out eight causes of action, four of which she directs at Nystrom: conspiracy to violate Plaintiff's civil rights under 42 U.S.C. § 1985 against Nystrom & Associates, Anderson, and Vinge (Count Five); negligent hiring, training, supervision, and retention against Nystrom & Associates (Count Six); medical malpractice against Nystrom & Associates, Anderson, and Vinge (Count Seven); and "negligent/intentional infliction of emotional distress" against Nystrom & Associates, Anderson, and Vinge (Count Eight). Nystrom denied plaintiff's claims, (ECF 42), and now brings this motion for judgment on the pleadings.

### A.    Count Five: Conspiracy to violate civil rights

In support of her civil rights conspiracy claim, Plaintiff alleges that Anderson and Mary Kay Libra, a social worker with the Department, knowingly conspired to deprive Plaintiff of her constitutional Fifth Amendment and civil rights. (*See* FAC ¶ 70). Plaintiff alleges the Hennepin County defendants: (1) "had prior knowledge of the wrongs conspired

to be committed by" certain defendants including Nystrom; and (2) "had the power to prevent or aid in preventing the commissions of the wrongs conspired to be committed by" certain defendants including Nystrom. (*Id.* at ¶¶ 151–52). As a consequence of the Hennepin County defendants' alleged failure "to prevent or aid in preventing the commissions of the wrongs conspired to be committed by" Libra and Anderson, Plaintiff alleges she suffered damages and injuries and has been deprived of her constitutional rights. (*Id.* at ¶¶ 153, 156–57). Plaintiff does not allege any class-based denial of equal protection under the law. (*See generally id.*).

> **B.** **Count Six: Negligent hiring, training, supervision, retention.**

To support her claim for negligent hiring, training, supervision, and retention, Plaintiff alleges Nystrom "willfully disregarded Plaintiff's rights" in numerous ways, including: (1) taking direction from Libra "to get [Plaintiff] to admit to allegations of abuse and condition participation [in family therapy] on those admissions"; (2) thwarting Plaintiff's reunification with her children by "purposefully neglecting" their duties with the objective of reunification per the case plan; and (3) recommending continuation of the no-contact order such that Plaintiff could not meet her case-plan objectives. (*Id.* at ¶¶ 160–62). Plaintiff alleges Nystrom failed to: (1) provide its employees "with proper training"; and (2) "outline proper procedures . . . with respect to appropriate conduct in interacting with parents whose goals outlined by the courts are to have reunification with their families and whose civil rights and constitutional rights are to be upheld." (*Id.* at ¶ 163). Plaintiff claims Nystrom breached its duty to use "due care in hiring, supervision, discipline,

training, and retention of psychologists, psychiatrists, and family therapists," and this breach is the direct and proximate result of plaintiff's injuries and damages. (*Id.* at ¶ 164).

### C.    Count Seven: Negligence in medical care

To support her medical negligence claim, Plaintiff alleges Nystrom was "negligent in rendering health care services to Plaintiff" as allegedly demonstrated by: (1) taking directives from Libra, who purportedly dictated the therapeutic objectives of treating a patient; (2) violating "a patient's" Fifth Amendment right against self-incrimination; (3) conditioning "a patient's" therapy on first admitting to a criminal offense against her penal interest; (4) "purposefully thwarting therapeutic goals and not providing necessary treatment to meet outlined objective and goals, but merely 'calming' patients during treatment sessions for more than a year"; and (5) "purposefully thwarting therapeutic goals by not recommending reunification or lifting a No-Contact ban where there is no criminal finding of physical abuse to intentionally effectuate termination of a patient's parental rights." (*Id.* at ¶ 166). Plaintiff further alleges that as a direct and proximate result of Nystrom's alleged actions, she "has suffered, and will continue to suffer, economic, physical, mental, emotional injury, and loss of familial association and irreparable harm to reputation." (*Id.* at ¶ 167).

### D.    Count Eight: Negligent/intentional infliction of emotional distress

In her claim styled "negligent/intentional infliction of emotional distress," Plaintiff seeks damages based on her assertion that certain defendants, including Nystrom, "acted individually and in concert to illegally effectuate the termination of [her] parental rights to her two children by unlawfully conditioning participation of family reunification only if

Plaintiff would admit to child abuse and misrepresenting to the [state court] that [Plaintiff] failed to comply with the court ordered case plan's requirement of completing family therapy." (*Id.* at ¶ 169). Plaintiff claims that "[b]ecause of Defendants' intentional and outrageous conduct, [she] has suffered emotional, mental and physical conditions generally recognized and diagnosed by trained professionals as stated above." (*Id.* at ¶ 171).

## ARGUMENT

### I.     This Court lacks subject-matter jurisdiction pursuant to the *Rooker-Feldman* doctrine.

#### A.     Standard of review

Federal Rule of Civil Procedure 12(b)(1) permits a party to move to dismiss a complaint for lack of subject matter jurisdiction at any time. *See Fort Bend Cnty., Tex. v. Davis*, ___ U.S. ___, 139 S. Ct. 1843, 1849 (2019) ("Unlike most arguments, challenges to subject-matter jurisdiction may be raised by the defendant at any point in the litigation, and courts must consider them *sua sponte*."); *United States v. Cotton*, 535 U.S. 625, 630 (2002) ("[S]ubject-matter jurisdiction, because it involves a court's power to hear a case, can never be forfeited or waived."). "If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action." Fed. R. Civ. P. 12(h)(3).

The *Rooker-Feldman* doctrine goes straight to the issue of subject matter jurisdiction. Under that doctrine, "the lower federal courts do not have subject matter jurisdiction over certain challenges to state-court judgments." *P.G. v. Ramsey Cnty.*, 141 F. Supp. 2d 1220, 1229–30 (D. Minn. 2001) (citing *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983)); *see Robins v. Ritchie*, 631 F.3d 919, 925 (8th Cir. 2011) ("The basic theory of the *Rooker–*

*Feldman* doctrine is that only the United States Supreme Court has been given jurisdiction to review a state-court decision, so federal district courts generally lack subject-matter jurisdiction over attempted appeals from a state-court judgment."). Accordingly, the standard of review on a motion raising a *Rooker-Feldman* argument differs from a standard motion to dismiss in that "the Court is 'free to weigh the evidence and satisfy itself as to the existence of its power to hear the case.'" *P.G.*, 141 F. Supp. 2d at 1230 (quoting *Osborn v. United States,* 918 F.2d 724, 730 (8th Cir. 1990)). Consequently, "no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims." *Id.*

**B.    The *Rooker-Feldman* doctrine deprives this Court of subject-matter jurisdiction over Plaintiff's claims.**

This Court lacks subject-matter jurisdiction over Plaintiff's claims because the complaint impermissibly seeks rejection of the state-court order terminating Plaintiff's parental rights. "Rooker-Feldman is implicated in that subset of cases where the losing party in a state court action subsequently complains about that judgment and seeks review and rejection of it." *Skit Int'l, Ltd. v. DAC Techs. of Ark., Inc.*, 487 F.3d 1154, 1157 (8th Cir. 2007); *see Robins*, 631 F.3d at 925 (stating doctrine is narrow, applying only to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the [federal] court proceedings commenced and inviting district court review and rejection of those judgments"). The doctrine "bars both straightforward and indirect attempts by a plaintiff to undermine state court decisions[;]. . . . [l]itigants may not pursue federal claims with allegations that are inextricably intertwined with a state court

9

decision." *Prince v. Ark. Bd. of Exam'rs in Psychology*, 380 F.3d 337, 340 (8th Cir. 2004) (quotation omitted). A claim is inextricably intertwined with a state court judgment if it "succeeds only to the extent that the state court wrongly decided the issues before it or if the relief requested . . . would effectively reverse a state court decision or void its ruling." *Fielder v. Credit Acceptance Corp.*, 188 F.3d 1031, 1035 (8th Cir. 1999).

Plaintiff's claims in this action are so inextricably intertwined with the state court judgment that the damage Plaintiff alleges *is* the termination of her parental rights by the state court's order. The argument she presents here—that various defendants conspired to violate her Fifth Amendment rights, which prevented her from successfully completing her case plan, which prevented reunification with her children—is the same argument she advanced to the state court that tried, and decided, the TPR matter. (ECF 47 § 25.8). The termination order came after a lengthy trial, during which the court received copious amounts of evidence in the form of witness testimony and exhibits. (*See id.* at §§ 9.0, 11.0, 12.0). The court even specifically addressed Plaintiff's argument that she was being forced to admit abuse or have her rights terminated:

> Ms. Nordgren's main argument in this case is that nothing progressed on her case plan because she was prohibited from contact with her children. Ms. Nordgren argues that the Department, service providers, and foster parents are to blame because they did not truly want the family to reunify. The Court does not find that this argument is supported by the evidence. . . . Ms. Anderson met with Ms. Nordgren twice, but opined that Ms. Nordgren was not amenable to reunifying with the children because she refused to apologize to the children for anything. Ms. Temple also met with Ms. Nordgren and similarly believes that having the children meet with Ms. Nordgren would be counterproductive when she refuses to acknowledge that she has hurt them in any way. Ms. Nordgren

maintains that she should not have to apologize for allegations that are not true, which is what the Department and professionals are trying to force her to do. The Court does not agree. Ms. Libra, Ms. Anderson, and Ms. Temple all testified that Ms. Nordgren can disagree with the children's specific allegations and still take accountability for other mistakes. . . . This is one example of Ms. Nordgren's unreasonable behavior in this case that has contributed to the prolonged period of no contact. It demonstrates Ms. Nordgren's lack of insight regarding her children's needs. It also demonstrates that Ms. Nordgren is overly rigid and is reticent to admit to mistakes or make sacrifices for her children, which causes the Court concern for Ms. Nordgren's mental health and her ability to safely parent the children. . . .

(*Id.* at § 25.8).

This state-court determination is inextricably intertwined with the matter before this Court. Were this Court to ultimately conclude Plaintiff is entitled to the relief she seeks—damages arising out of the termination of her parental rights—it would necessarily have to conclude that "the state court wrongly decided the issue[] before it," *Fielder*, 188 F.3d at 1035, i.e. that the state court wrongfully terminated Plaintiff's parental rights. This falls squarely within *Rooker-Feldman*. *See, e.g.*, *P.G.*, 141 F. Supp. 2d at 1230 (stating that "it is apparent by the relief Plaintiffs seek and the arguments they make that their claims either seek review of the juvenile court judgment or are inextricably intertwined with the matter before the juvenile court," and "[w]ere this Court to grant Plaintiffs the relief they request, any order issued by the juvenile court terminating P.G.'s parental rights would be voided[,] . . . . [which] is the precise effect the *Rooker-Feldman* doctrine is designed to prevent"). This Court lacks subject matter jurisdiction in this matter and should dismiss Plaintiff's claims against Nystrom in their entirety.

11

**II.    Nystrom is entitled to judgment on the pleadings because Plaintiff's complaint fails to plausibly allege any claim against Nystrom.**

**A.    Standard of review**

Federal Rule of Civil Procedure 12(c) permits a party to bring a motion for judgment on the pleadings after the pleadings are closed. The standard of review for a motion brought under Rule 12(c) is the same as that for a motion brought under Rule 12(b)(6). *In re Pre-Filled Propane Tank Antitrust Litig.*, 893 F.3d 1047, 1056 (8th Cir. 2018). To survive a motion for judgment on the pleadings, a complaint "must contain enough facts to state a claim to relief that is plausible on its face.' *Horras v. Am. Cap. Strategies, Ltd.*, 729 F.3d 798, 801 (8th Cir. 2013). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The Court "is required to construe all well pleaded factual allegations of the non-moving party as true, and to draw in favor of that party all reasonable inferences from these facts." *Iowa Beef Processors, Inc. v. Amalgamated Meat Cutters & Butcher Workmen of N. Am., AFL-CIO*, 627 F.2d 853, 855 (8th Cir. 1980). This tenet does not apply to legal conclusions, "formulaic recitation of the elements of a cause of action," or factual assertions that are so indeterminate as to require further factual enhancement. *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009).

In considering a motion for judgment on the pleadings, the Court "generally may not consider matters outside the pleadings." *von Kaenel v. Armstrong Teasdale, LLP*, 943 F.3d 1139, 1143 (8th Cir. 2019). There are some exceptions to this rule, however: material that the complaint incorporates by reference or that is integral to the claim, material of

12

which the court may take judicial notice, matters of public record, items in the record of the case, and exhibits attached to the complaint and whose authenticity is unquestioned. *Id.*

**B.    Nystrom is immune from suit based on its involvement in Plaintiff's child protection proceedings.**

Nystrom is immune from liability arising out of its involvement with Plaintiff's children because it was performing a quasi-judicial function by providing therapy services to the children and advising the state court on the children's best interests. "A judge or judicial officer cannot be held liable to anyone in a civil action for 'acts done in the exercise of judicial authority.'" *Myers Through Myers v. Price*, 463 N.W.2d 773, 775–76 (Minn. App. 1990) (quoting *Linder v. Foster,* 209 Minn. 43, 45, 295 N.W. 299, 300 (1940)). "Because judicial immunity is designed to protect the judicial process, it also extends to persons who are integral parts of that process." *Id.* (citing *Briscoe v. LaHue,* 460 U.S. 325, 335 (1983)). "Courts have extended this 'quasi-judicial' immunity to court-appointed psychiatrists and physicians who prepare and submit medical evaluations relating to judicial proceedings." *Id.*; *see Myers v. Morris*, 810 F.2d 1437, 1466–67 (8th Cir. 1987) (applying quasi-judicial immunity "for damages claims arising from their performance of the delegated functions" to "nonjudicial person who fulfill quasi-judicial functions intimately related to the judicial process," specifically including psychiatrists and therapists), *abrogated on other grounds by Burns v. Reed*, 500 U.S. 478 (1991); *cf. Tindell v. Rogosheske*, 428 N.W.2d 386, 387 (Minn. 1988) (reasoning "[i]mmunity is necessary to avoid harassment from disgruntled parents who may take issue with any or all of the guardian[] [ad litem's] actions" so guardian is free to "engage in a vigorous and autonomous representation of the child").

Nystrom cannot be sued for acts performed pursuant to its appointment to provide therapy services to the children and opinions regarding the suitability of reuniting the children with Plaintiff. *Peterka v. Dennis*, 764 N.W. 2d 829 (Minn. 2009). Nystrom was appointed to provide services to Plaintiff's children after the state court issued its Order for CHIPS Adjudication and Foster Care Placement on October 5, 2015. (*See* ECF 72). Nystrom's appointed function as part of the child-protection proceeding was to provide therapy services to Plaintiff's children, to assess the children's readiness for family therapy, to provide that family therapy if and when the family was ready for it, and to advise the Department and the court on the children's progress and whether the family could be reasonably reunited. (ECF 47 §§ 23.2-.3). The state court relied on Nystrom's recommendations when deciding whether to lift the no-contact order. (*See* FAC ¶ 80; ECF 47 §§ 25.1-.2). In doing so, Nystrom performed a quasi-judicial function intimately related to the judicial process, i.e. it evaluated the children's preparedness for family therapy and eventual reunification. *See Myers*, 810 F.2d at 1466–67 (applying quasi-judicial immunity to "nonjudicial person who fulfill quasi-judicial functions intimately related to the judicial process"); *Linder*, 209 Minn. at 45, 46, 295 N.W.2d at 300 (concluding that quasi-judicial immunity protects one from civil liability not only for decisions made in a judicial capacity but more broadly for "acts done in the exercise of judicial authority," "however erroneous, or by whatever motives prompted").

While providing services to Plaintiff's children, Nystrom determined that, before any family therapy could be successful, the children needed to feel safe with Plaintiff. (ECF 47 § 23.2). In Nystrom's opinion, for the children to feel safe, Plaintiff needed to

acknowledge that her actions had hurt the children and that the children needed to hear an apology from her. (*Id.*). Plaintiff's specific accusation against Nystrom arises from its performance of this function. (*See generally* FAC). Specifically, Plaintiff alleges that, by conditioning family therapy on Plaintiff apologizing to the children, Nystrom "deprived" her of her constitutional rights when it "required [Plaintiff]to first admit to allegations of abuse before determining she was ready for family therapy." (*Id.* at ¶ 78; *see, e.g.*, *id.* at ¶¶ 76 ("[B]ecause [Plaintiff] would not admit to child abuse, [Anderson] assessed that [Plaintiff] was not ready for family therapy"), 81 ("Libra clearly understood that without admissions of abuse from [Plaintiff], Anderson would not proceed with reunification."), 155-56 ("Defendants . . . acted . . . with a willful and conscious disregard of [Plaintiff's]rights. . . . As a direct and foreseeable consequence . . . , [Plaintiff]was deprived of her rights under . . . the United States Constitution."), 166 ("Defendants . . . were . . . negligent in rendering health care services to Plaintiff . . . by . . . [v]iolating a patient's 'clearly established' 5th Amendment right from self-incrimination[] [and] . . . [c]onditioning patient's therapy first on the requirement that the patient admit to criminal offense that is against his/her penal interest."); *see generally* FAC). The state court considered this argument when Plaintiff made it during the TPR proceeding, and rejected the contention that Nystrom or anyone else required her to "apologize for allegations that are not true."[4] (ECF 47 § 25.8; *see also id.* at § 23.2 ("Anderson testified that she was not

---

[4] The state court specifically stated that Libra, Anderson, and Nancy Temple "all testified that Ms. Nordgren can disagree with the children's specific allegations and still take accountability for other mistakes," (ECF 47 § 25.8), i.e. Plaintiff could apologize for non-criminal behavior to meet that precondition to begin family therapy. The state court even

looking for [Plaintiff] to own up to specifics regarding alleged abuse, but rather was looking for [Plaintiff] to apologize for abuse generally.")).

All of these actions were taken and decisions were made in the course of Nystrom's performance of its obligation to provide services to the children pursuant to the CHIPS petition, and to provide facts and information to the Department and the state court in determining whether to terminate Plaintiff's parental rights. It was Nystrom's professional opinion that family therapy would not be successful if Plaintiff was unwilling to apologize to the children, because an apology would help the children feel safe with her. (*Id.* at §§ 23.2-.3). Nystrom is protected by immunity because it cannot be held liable for alleged damages arising from its appointed functions, *Myers*, 810 F.2d at 1466–67, and "[t]here is no evidence [it] or anyone associated with [it] acted beyond the scope of [its] court appointment." *Myers Through Myers*, 463 N.W.2d at 776.

Moreover, even setting aside the district court's explicit determination that no one mandated that Plaintiff incriminate herself, (ECF 47 § 25.8), discussing the prerequisites for family therapy with Plaintiff and determining whether she met those prerequisites "was necessary to perform the functions of determining the children's needs, protecting their interests and making recommendations to the family court." *Myers*, 810 F.2d at 1467. Accordingly, as an alternative to quasi-judicial immunity, Nystrom also has absolute immunity for Plaintiff's claims arising from the function of evaluating the children. *Id.*

---

provided an example: "For instance, Ms. Nordgren could apologize to the children for kicking them out of her house on Christmas Eve. This, understandably, upset the children. While it may be true that the children were being rude or frustrating, Ms. Nordgren's response was extreme and hurtful." (*Id.*).

And, to the extent Plaintiff's alleged damages arise from Nystrom's testimony before the state court, it has "absolute immunity for claims arising from the function of questioning" her. *Id.*

### C. Minnesota does not recognize general direct corporate negligence claims against healthcare facilities, therefore the Court should dismiss Plaintiff's Count Six.

Plaintiff's Count Six alleges a single "claim" for "negligent hiring, training, supervision, retention." (FAC ¶¶ 158-165). This count alleges direct negligence by Nystrom. Negligent hiring, retention, and supervision[5] are all negligence claims alleged against an employer directly for its alleged negligence regarding its employees. *See Damgaard v. Avera Health*, 108 F. Supp. 3d 689, 693 (D. Minn. 2015) (stating plaintiff makes claims that defendant is "*directly* liable to [plaintiff], rather than *vicariously* liable for [its doctor-employee's] alleged negligence, because [defendant] failed to adequately instruct, train, or supervise employees"); *M.L. v. Magnuson*, 531 N.W.2d 849, 856 (Minn. App. 1995) ("Minnesota recognizes three causes of action where a claimant sues an employer in negligence for injuries caused by one of its employees: negligent hiring, negligent retention, and negligent supervision."). "These negligent employment theories are distinct from the doctrine of respondeat superior[,] . . . . [which] imposes vicarious liability on an employer for all acts of its employees that occur within the scope of their employment, regardless of the employer's fault." *Id.* "Negligent employment imposes direct liability on the employer only where the claimant's injuries are the result of the

---

[5] Plaintiff also alleges "negligent training" against Nystrom, but negligent training is not a cognizable claim under Minnesota law. (*See* § II.D.2.i *infra*).

employer's failure to take reasonable precautions to protect the claimant from the misconduct of its employees." *Id.*

Minnesota law does not permit direct corporate negligence claims against a healthcare provider. *See Damgaard*, 108 F. Supp. 3d at 693 (acknowledging that direct corporate negligence claims against a healthcare provider "are not cognizable under Minnesota law"); *Larson v. Wasemiller*, 738 N.W.2d 300, 313 (Minn. 2007) (recognizing a claim for "negligent credentialing" but not for direct corporate negligence generally against a healthcare provider); *Bothun v. Martin LM, LLC*, 2013 WL 1943019, at *5 (Minn. App. May 13, 2013) (affirming dismissal of direct corporate negligence claim, rejecting argument that *Larson* impliedly recognized broader cause of action for direct corporate negligence). To the extent these causes of action exist in any capacity under Minnesota law, (*see* § II.D.2.i *infra*), they allege direct corporate negligence and are not viable claims against a healthcare provider. Because Nystrom is a healthcare provider, Plaintiff may not bring a direct corporate negligence claim against it, and her Count Six should be dismissed as a matter of law.

### D. Plaintiff's complaint lacks facial plausibility as to each claim alleged against Nystrom.

Alternatively, if *Rooker-Feldman* does not bar Plaintiff's claims and Nystrom is not immune from liability arising from its appointment to provide therapy services to the children, Plaintiff's complaint still lacks facial plausibility such that the Court could draw a reasonable inference that Nystrom is liable for the misconduct Plaintiff alleges. *Horras*, 729 F.3d at 801.

### 1. Plaintiff fails to allege any facts plausibly establishing Nystrom's liability for an alleged conspiracy to violate her civil rights.

Plaintiff's Count Five alleges a conspiracy to interfere with Plaintiff's civil rights under 42 U.S.C. § 1985 against the Hennepin County defendants, Nystrom, and Rice. (FAC ¶¶ 149-157). To plausibly allege a claim under section 1985, Plaintiff must allege (1) that the identified defendants conspired; (2) "for the purpose of depriving [her], either directly or indirectly, . . . of the equal protection of the laws, or of equal privileges and immunities under the laws"; (3) that one or more of the conspirators did, or caused to be done, "any act in furtherance of the object of [the] conspiracy"; and (4) that Plaintiff was "injured in [her] person or property" or was "deprived of having and exercising any right or privilege of a citizen of the United States." 42 U.S.C. § 1983(3)[6]; *see Griffin v. Breckenridge,* 403 U.S. 88, 102–03 (1971); *Andrews v. Fowler*, 98 F.3d 1069, 1079 (8th Cir. 1996). "[P]laintiff must show that the conspiracy is fueled by some 'class-based, invidiously discriminatory animus.'" *Id.* (quoting *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 268 (1993)). Plaintiff must also "allege with particularity and specifically demonstrate with material facts that the defendants reached an agreement." *Larson by Larson v. Miller*, 76 F.3d 1446, 1454 (8th Cir. 1996). And "[a]bsent a constitutional violation, there is no actionable conspiracy claim." *In re Kemp*, 894 F.3d 900, 910 (8th Cir. 2018).

None of the allegations in Count Five address the required elements of a section 1985(3) claim. Instead, Count Five specifically calls out the Hennepin County defendants and allege: (1) they "had prior knowledge of the wrongs conspired to be committed by"

---

[6] Plaintiff does not specify which subsection of section 1985 her claim purportedly arises under, but the only possibly applicable subsection is section 1985(3).

Nystrom and other defendants, (FAC ¶ 151); (2) they "had the power to prevent or aid in preventing the commissions of the wrongs conspired to be committed by" Nystrom and other defendants, (*id.* at ¶ 152); (3) Plaintiff suffered damages "as a direct and proximate result of the neglect and/or refusal of" the Hennepin County defendants "to prevent or to aid in preventing the commissions of the wrongs conspired to be committed by" Nystrom and other defendants, (*id.* at ¶ 153); (4) the Hennepin County defendants' "actions evidence a reckless and callous disregard for, and deliberate indifference to, Nordgren's constitutional rights," (*id.* at ¶ 154); (5) these defendants "acted with malice and with the intent to cause injury to Nordgren or acted with a willful and conscious disregard of Nordgren's rights," (*id.* at ¶ 155), and (6) they "deprived" Plaintiff of various constitutional rights, (*id.* at ¶ 156).

None of these allegations plausibly allege a conspiracy to violate Plaintiff's civil rights under section 1985(3). Nowhere does Plaintiff allege facts that plausibly demonstrate a civil conspiracy, i.e. "a combination of two or more persons acting in concert to commit an unlawful act, . . . the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damage." *Rotermund v. U.S. Steel Corp.*, 474 F.2d 1139, 1145 (8th Cir. 1973) (quotations omitted). True, Plaintiff says that Nystrom and Libra allegedly conspired to force her to violate her Fifth Amendment rights to be reunified with her children, but this does not constitute a "conspir[acy] . . . for the purpose of depriving, either directly or indirectly, any person . . . of the equal protection of the laws, or of equal privileges and immunities under the laws." 42 U.S.C. § 1985(3).

The Minnesota Supreme Court has addressed the circumstance where a court's order "directly required the parties to incriminate themselves in order to avoid termination" of their parental rights, and determined that this violates a parent's Fifth Amendment privilege. *Matter of Welfare of J.W.*, 415 N.W.2d 879, 883 (Minn. 1987). The court in that case concluded that "[t]his means that appellants' noncompliance with the order requiring them to divulge [potentially incriminating information] . . . to psychologists, cannot be used as grounds . . . for termination of parental rights nor for keeping [the children] in foster care." *Id.* The court went on to state, however, that

> *this is as far as the privilege extends protection.* While the state may not compel therapy treatment that would require appellants to incriminate themselves, it may require the parents to otherwise undergo treatment. Therapy, however, which does not include incriminating disclosures, may be ineffective; and ineffective therapy may hurt the parents' chances of regaining their children. These consequences lie outside the protective ambit of the Fifth Amendment.

*Id.* (emphasis added); *see Matter of Welfare of J.G.W.*, 433 N.W.2d 885, 886 (Minn. 1989) (highlighting that the *J.W.* Court "also said that while the state could not directly compel the parents to incriminate themselves as part of the treatment plan, the state could require the parents to undergo treatment successfully and that the parents' failure to admit their guilt might as a practical matter make them fail in treatment"); *id.* (stating explicitly, "[w]e granted review because we believe that the second part of our holding in *J.W.*, that the privilege does not protect the parent from the consequences of any failure to succeed in a court-ordered treatment plan[,] merits equal emphasis").

Plaintiff asserts that she was "required" to admit abuse in order to undergo family therapy, but she was not under any court order to do so. Instead, the court ordered her to

progress through a treatment plan. (*See* ECF 72). One requirement of that treatment plan was family therapy, which Nystrom did not believe would be effective unless Plaintiff first apologized for hurtful behavior toward the children in an effort to earn their trust. (ECF 47 §§ 23.2-.3). And the state court did not ultimately terminate her parental rights because she did not "admit abuse," it terminated her parental rights because she failed to make progress in her treatment plan and termination was in the children's best interests. (*See generally id.*). One *reason* she failed to make progress is her unwillingness to take responsibility for actions that made the children feel hurt or unsafe, but "the privilege [against self-incrimination] does not protect the parent from the consequences of any failure to succeed in a court-ordered treatment plan." *J.G.W.*, 433 N.W.2d at 886.

Moreover, even if Plaintiff's complaint does plausibly allege a conspiracy that does fall within the narrow violation delineated in *J.W.*, nowhere in the complaint does Plaintiff allege even a single fact that would plausibly establish "the conspiracy is fueled by some class-based, invidiously discriminatory animus." *Andrews*, 98 F.3d at 1079; *see Larson by Larson*, 76 F.3d at 1454 ("The purpose element of the conspiracy requires that the plaintiff prove a class-based invidiously discriminatory animus."). Absent any allegation of race- or class-based conspiracy, Plaintiff's Count Five fails as a matter of law. *See Keefe v. City of Minneapolis*, 785 F.3d 1216, 1223–24 (8th Cir. 2015) (holding that, even if plaintiff established the other elements of a section 1985(3) claim, plaintiff "fails to raise a genuine dispute of material fact as to whether a conspiracy existed that was motivated by a class-based, invidiously discriminatory animus. . . . [,] [because he] fails to direct [the court] to anything in the record showing that a conspiracy existed that was fueled by some class-

based, invidiously discriminatory animus"). The Court should dismiss Count Five against Nystrom.

> **2.    Plaintiff fails to plausibly allege any claim for negligent hiring, negligent training, negligent supervision, or negligent retention.**

Count Six, alleged against Nystrom & Associates alone, asserts a claim for "negligent hiring, training, supervision, retention." (FAC ¶ 158-165). Minnesota recognizes three distinct claims for negligent hiring, negligent supervision, and negligent retention, *see M.L.*, 531 N.W.2d at 858, but does not recognize a claim for negligent training, *see Johnson v. Peterson*, 734 N.W.2d 275, 277 (Minn. App. 2007). Plaintiff's complaint lacks facial plausibility because, in addition to these claims constituting direct corporate negligence claim against Nystrom & Associates, impermissible under Minnesota law, (*see* § II.C *supra*), Plaintiff has not pleaded sufficient facts to "allow[] the court to draw the reasonable inference that the [Nystrom] is liable for" negligent hiring, negligent supervision, or negligent retention. *Horras*, 729 F.3d at 801.

> **i.    Minnesota law does not recognize a claim for negligent training, therefore Plaintiff's Count Six, to the extent it alleges such a claim, must be dismissed.**

Plaintiff's amended complaint alleges that Nystrom & Associates failed to provide "proper training and failed to outline proper procedures" for "appropriate conduct in interaction with parents whose goals outlined by the courts are to have reunification with their families and whose civil rights and constitutional rights are to upheld," and that it "negligently breached [its] duty of care in . . . training" its employees. (FAC ¶¶ 163-64). But "Minnesota law does not recognize a cause of action for negligent training." *Johnson*, 734 N.W.2d at 277. Accordingly, this Court should dismiss Plaintiff's Count Six—to the

extent it alleges a negligent training claim—as a matter of law. *See Burns v. Winroc Corp. (Midwest)*, 565 F. Supp. 2d 1056, 1068 (D. Minn. 2008) (dismissing plaintiff's negligent training claim with prejudice because Minnesota does not recognize such a claim); *McKenzie v. Lunds, Inc.*, 63 F. Supp. 2d 986, 1007–08 (D. Minn. 1999) (same) (citing cases).

### ii.    Plaintiff's complaint fails to plausibly allege any facts establishing a negligent supervision claim.

Plaintiff's negligent supervision claim is not viable under Minnesota law because it alleges direct corporate negligence against a healthcare provider, but even if it were legally viable, Plaintiff fails to state a claim on which relief can be granted. Negligent supervision "is the failure of the employer to exercise ordinary care in supervising the employment relationship, so as to prevent the foreseeable misconduct of an employee from causing harm to . . . third persons." *M.L.*, 531 N.W.2d at 858. The foreseeability prong of the duty element on a negligent supervision claim requires evidence "that the employer knew or should have known that the employee was violent or aggressive and might engage in injurious conduct." *Johnson*, 734 N.W.2d at 277-78. Moreover, the injury alleged to be the result of the negligent supervision "must also be physical in nature as opposed to solely economic." *Darmer v. State Farm Fire & Cas. Co.*, No. CV 17-4309 (JRT/KMM), 2020 WL 514261, *14 (D. Minn. Jan. 31, 2020); *see also id.* (rejecting plaintiff's argument that PTSD exacerbated by alleged negligent supervision constituted physical injury).

Plaintiff's FAC does not even attempt to articulate the elements of a negligent supervision claim. Nowhere does Plaintiff allege that Nystrom's employees acted in a "violent or aggressive" manner. Instead, she alleges Nystrom: (1) "knowingly and willfully

disregarded Plaintiff's rights where they undertook directives from . . . Hennepin County . . . in setting therapeutic objectives"; (2) "knowingly and willfully disregarded Plaintiff's rights where they undertook every attempt to thwart reunification . . . by purposefully neglecting to perform their duties required"; and (3) "knowingly and willfully disregard[ed] Plaintiff's rights by purposefully recommending that the No Contact Order not be lifted." (FAC ¶¶ 160-62). Plaintiff does not allege that Nystrom should have foreseen its employees' misconduct or that Nystrom failed to use ordinary care in supervising its employees. Instead she alleges Nystrom "failed to provide [its employees] . . . with proper training and failed to outline proper procedures to its employees and staff with respect to appropriate conduct in interacting with parents whose goals outlined by the courts are to have reunification with their families and whose civil rights and constitutional rights are to be upheld." (*Id.* at 163). Plaintiff then alleges that Nystrom "negligently breached [its] duty to use due care in . . . supervision . . . of psychologists, psychiatrists, and family therapists[,] which directly and proximately resulted in injuries and damages to Plaintiff." (*Id.* at ¶ 164). Even if negligent supervision were a viable claim against a healthcare provider, plaintiff's complaint is devoid of any facts that would allow the court to draw the reasonable inference that Nystrom is liable for negligent supervision, i.e. that it knew its employees were "violent or aggressive and might engage in injurious conduct," *Johnson*, 734 N.W.2d at 277-78, or that Plaintiff was, in fact, physically injured by those employees. The Court should grant Nystrom judgment on the pleadings on Plaintiff's Count Six to the extent it asserts a claim for negligent supervision.

iii.   **Plaintiff's complaint fails to plausibly allege any facts that could lead this Court to conclude that Nystrom engaged in negligent hiring or negligent retention.**

Negligent hiring and negligent retention are distinct, but related, claims. *Yunker v. Honeywell, Inc.*, 496 N.W.2d 419, 423 (Minn. App. 1993). Because Plaintiff's amended complaint is equally devoid of any allegations establishing negligent hiring as it is of any allegations establishing negligent retention, this memorandum will address these two causes of action together.

"[N]egligent hiring and negligent retention, are based on direct, not vicarious, liability. . . . Negligent hiring and negligent retention do not rely on the scope of employment but address risks created by exposing members of the public to a potentially dangerous individual." *Yunker v. Honeywell, Inc.*, 496 N.W.2d 419, 422 (Minn. App. 1993) (citing *Ponticas v. K.M.S. Inv.,* 331 N.W.2d 907, 911 n. 5 (Minn. 1983)). Negligent hiring is "predicated on the negligence of an employer in placing a person with known propensities, or propensities which should have been discovered by reasonable investigation, in an employment position in which, because of the circumstances of the employment, it should have been foreseeable that the hired individual posed a threat of injury to others." *Id.* (quotation omitted). "Negligent retention[] . . . occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge, or reassignment." *Id.* at 423 (quotation omitted). Specifically, a negligent retention claim "recognize[s] the employer's duty to refrain from retaining employees with known dangerous proclivities." *Id.*

Without repeating the allegations in the FAC again, nothing in that document even hints at an allegation that Nystrom's employees "posed a threat of injury to others" or had "known dangerous proclivities," either before or during their employment, nor is there any allegation that Nystrom failed to take further action despite that knowledge. There is simply no reasonable inference to draw from any allegation that Nystrom could be liable for negligent hiring or negligent retention. The Court should dismiss Plaintiff's Count Six to the extent it asserts a claim for negligent hiring or negligent retention.

### 3.    Plaintiff fails to plausibly allege a medical malpractice because Plaintiff was not Nystrom's patient, therefore Plaintiff cannot establish the duty element of a medical negligence claim.

Plaintiff's Count Seven alleges medical negligence against Nystrom. (*See* FAC ¶¶ 166-167). To establish a claim for medical negligence[7], Plaintiff must prove the essential elements of her claim: "(1) the standard of care recognized by the medical community as applicable to [Nystrom's] conduct, (2) that [Nystrom] in fact departed from that standard, and (3) that [its] departure from the standard was a direct cause of [Plaintiff's] injuries." *MacRae v. Grp. Health Plan, Inc.*, 753 N.W.2d 711, 717 (Minn. 2008). A healthcare provider is generally only liable to a particular plaintiff for malpractice where there is a provider-patient relationship with that plaintiff. *Henkemeyer v. Boxall*, 465 N.W.2d 437, 439 (Minn. App. 1991); *see Schendel v. Hennepin Cnty. Med. Ctr.*, 484 N.W.2d 803, 807–08 (Minn. App. 1992) ("An essential element of proof in a medical

---

[7] Plaintiff must also comply with the expert affidavit requirements of Minn. Stat. § 145.682. Because she has not served the affidavit of expert review within the mandated timeframe, Count Seven must be dismissed. *See* Minn. Stat. § 145.682, subds. 2(1), 3(1), 6(a). Pursuant to subsection 6(a) of that statute, Nystrom has filed a motion to dismiss for failure to comply with section 145.682 simultaneously with this motion.

malpractice case is the existence of a physician-patient relationship."). This is because a healthcare provider's duty to a patient arises out of that provider-patient relationship. *Henkemeyer*, 465 N.W.2d at 439.

Nystrom did not provide services to Plaintiff, it provided services to Plaintiff's children, would have provided family therapy if it determined that family therapy was appropriate, and advised the state court on the best interests of the children with respect to the no-contact order, family reunification, and termination of Plaintiff's parental rights. (ECF 47 § 23.2). As stated in the FAC, Plaintiff received counseling from The Family Partnership and Headway Emotional Health Services. (FAC ¶¶ 84, 86). Plaintiff also "completed a psychological evaluation and parenting assessment . . . through Hennepin County Medical Center," (ECF 47 § 19.0), and "engaged in anger management and individual therapy through the Veteran's Administration Center," (*id.* at § 22.1). Anderson met with Plaintiff to determine whether she demonstrated recognition of and willingness to apologize for the improper behavior she displayed toward her children, and Plaintiff made it clear that she would not apologize for anything. (*Id.* at §§ 23.3-.4). Nystrom never provided services to Plaintiff, because she would not make the prerequisite steps toward family therapy, therefore family therapy and eventual reunification of the children with Plaintiff never became in the children's best interests. (*Id.* at §§ 23.4-.5; *see also id.* at §§ 23.7.2.6-.7). As a result, there is no provider-patient relationship between Nystrom and Plaintiff to give rise to any duty by Nystrom to Plaintiff. *See Henkemeyer*, 465 N.W.2d at 439 (Minn. App. 1991). The Court should dismiss Count Seven.

4.    **Plaintiff fails to plausibly allege facts supporting claims for negligent infliction of emotional distress and intentional infliction of emotional distress.**

Plaintiff's Count Eight purports to assert a claim for "negligent/intentional infliction of emotional distress." Although negligent infliction of emotional distress (NIED) and intentional infliction of emotional distress (IIED) are distinct claims with distinct factual elements, this count fails to distinguish these causes of action and wholesale fails to plausibly allege a cause of action for either one. The Court should dismiss Plaintiff's Count Eight as against Nystrom.

i.    **The FAC lacks facial plausibility as to Plaintiff's NIED claim.**

"To state a claim for NIED, a plaintiff must prove the four elements of a negligence claim, as well as three additional elements specific to NIED claims." *Engler v. Illinois Farmers Ins. Co.*, 706 N.W.2d 764, 767 (Minn. 2005). "The four elements of negligence are: (1) the existence of a duty of care; (2) a breach of that duty; (3) an injury; and (4) the breach of the duty being the proximate cause of the injury." *Id.* Additionally, "a plaintiff claiming NIED must prove that 'she: (1) was within the zone of danger of physical impact [created by the defendant's negligence]; (2) reasonably feared for her own safety; and (3) [consequently] suffered severe emotional distress with attendant physical manifestations.'" *Id.* (quoting *K.A.C. v. Benson*, 527 N.W.2d 553, 557 (Minn. 1995)) (alterations original).

Setting aside whether Plaintiff can establish the negligence requirements, she does not plausibly allege any facts establishing the three additional required elements to state an NIED claim. Plaintiff has not—and cannot—alleged facts establishing that she was "within the zone of danger of physical impact" created by Nystrom's alleged negligence.

Minnesota courts "ha[ve] limited the zone of danger analysis to encompass plaintiffs who have been in some *actual personal physical danger* caused by defendant's negligence." *K.A.C.*, 527 N.W.2d at 558 (emphasis added). There is no allegation that Nystrom created any "personal physical danger" to Plaintiff when it provided therapy services to her children. As a result, Plaintiff necessarily cannot establish that essential element of NIED. The Court should dismiss Count Eight to the extent it alleges an NIED claim.

### ii. The FAC lacks facial plausibility as to Plaintiff's IIED claim.

"Intentional infliction of emotional distress consists of four distinct elements: (1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe." *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003) (citing *Hubbard v. United Press International, Inc.*, 330 N.W.2d 428, 438-39 (Minn. 1983); Restatement (Second) of Torts § 46(1) (1965)). Recovery is "sharply limited" to a situation "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Odegard v. Finne*, 500 N.W.2d 140, 144 (Minn. App. 1993) (quoting *Hubbard*, 330 N.W.2d at 439). The actor must intend to cause severe emotional distress or proceed with the knowledge that it is substantially certain, or at least highly probable, that severe emotional distress will occur. *Dornfeld v. Oberg*, 503 N.W.2d 115, 119 (Minn. 1993). \IIED is further limited to circumstances "involving particularly egregious facts," where the distress inflicted is "so severe that no reasonable [person] could be expected to endure it." *Hubbard*, 330 N.W.2d at 439. Liability for intentional infliction of emotional distress does not extend to "insults, indignities, threats, annoyances, petty oppressions, or other

trivialities." *Langeslag*, 664 N.W.2d at 865. To qualify as extreme and outrageous, the conduct must lead an average member of the community to exclaim: "Outrageous!" *Id.*

The scope of an IIED claim is constrained by "the extreme nature of the conduct necessary to invoke this tort, and the necessary degree of severity of the consequent mental distress," and such limitations "reflect[] a strong policy to prevent fictitious and speculative claims." *Hubbard*, 330 N.W.2d at 439. Courts consistently require that the severe emotional distress alleged must be "emotional distress that no reasonable person could be expected to endure." *Langeslag*, 664 N.W.2d at 865; *see, e.g.*, *Hubbard*, 330 N.W.2d at 440 (holding that evidence of depression, vomiting, stomach disorders, skin rash and high blood pressure was insufficient to show severe emotional distress); *Odegard*, 500 N.W.2d at 144 (finding depression, impairment of ability to trust, and damaged relationship with children insufficient to show severe emotional distress). Courts also consistently require that "[t]he type of outrageous conduct contemplated by this tort is conduct 'so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community.'" *Tibbetts v. Crossroads, Inc.*, 411 N.W.2d 535, 538 (Minn. App. 1987) (quoting *Hubbard*, 330 N.W.2d at 438–39); *see, e.g.*, *Shank v. Carleton Coll.*, 232 F. Supp. 3d 1100, 1114 (D. Minn. 2017) (finding no "conduct that is intolerable in a civilized society" where plaintiff alleged defendant (1) failed to suspend or expel two students who raped her; (2) failed to appeal minimal sanctions against one perpetrator; (3) failed to provide plaintiff with a copy of a no-contact order for months after its issuance and failed to take action when perpetrator violated that order; (4) refused to give plaintiff written outcome of the hearing against one perpetrator; and (5) allowed the campus to be a "zone

31

of danger"); *Thomsen v. Ross*, 368 F. Supp. 2d 961, 977 (D. Minn. 2005) (concluding plaintiff failed to demonstrate requisite "utterly intolerable in a civilized society" conduct even where plaintiff alleged defendants (1) strip searched him while he was unconscious; (2) waited 48 hours to provide necessary medical treatment in once instance and three days in another; (3) took him to the hospital in a canine squad car; (4) once failed to give him pain medication; and (5) three times opened his legal mail). The conduct certainly must be more than even "clearly unreasonable." *See Shank*, 232 F. Supp. 3d at 1114. ("[T]here is a big difference between conduct that is clearly unreasonable and conduct that is utterly intolerable in a civilized society. Civilized societies tolerate a lot of unreasonable conduct.").

Plaintiff's FAC fails to plausibly allege IIED. First, she merely recites some of the elements of an IIED claim, but she does not state facts plausibly alleging the existence of those elements. Instead, Plaintiff simply states that the defendants engaged in "a pattern of extreme and outrageous behavior that is shocking to the conscience of any ordinary citizen that was pursued with the intent to cause and resulted in Nordgren suffering severe emotional distress." (FAC ¶ 170). But this is a legal conclusion to which the Court pays no deference. *Braden*, 588 F.3d at 594. And, in any event, the allegations are insufficient to plausibly allege an IIED claim.

Second, Nystrom provided therapy services to Plaintiff's children, assessed the family to determine its suitability for family therapy, and made recommendations to the state court. (ECF 47 § 23.0). In doing so, it reasonably determined that Plaintiff needed to take responsibility for some of her behavior that had hurt the children, and stated that, in

order to help the children feel safe and move forward with family therapy, Plaintiff had to be able to apologize to the children for that behavior. Nothing in the FAC plausibly alleges any "particularly egregious facts" that would reasonably cause "distress . . . so severe that no reasonable [person] could be expected to endure it." *Hubbard*, 330 N.W.2d at 439. While Plaintiff may have found it personally difficult to take responsibility for her actions, requiring her to do so cannot have been particularly egregious or so severely distressing that no reasonable person could be expected to endure it. It simply is not "utterly intolerable" to be asked to apologize for harmful behavior. *Thomsen*, 368 F. Supp. 2d at 977. And Plaintiff alleges no other facts regarding either the outrageous conduct or the severe mental distress required to plausibly establish Nystrom's liability for IIED. The Court should dismiss Plaintiff's Count Eight to the extent it asserts an IIED claim.

## CONCLUSION

For the reasons stated herein, Nystrom respectfully asks this Court to grant its motion for judgment on the pleadings and to dismiss Plaintiff's claims against these defendants in their entirety.

Respectfully submitted,

Dated: <u>May 14, 2021</u>                    /s/ Julia J. Nierengarten
                                              Nicole L. Brand (#299546)
                                              Julia J. Nierengarten (#0391851)
                                              Besse H. McDonald (#0398662)
                                              **Meagher & Geer, P.L.L.P.**
                                              33 South Sixth Street, Suite 4400
                                              Minneapolis, MN 55402
                                              (612) 338-0661
                                              nbrand@meagher.com
                                              jnierengarten@meagher.com
                                              bmcdonald@meagher.com

*Attorneys for Defendants Nystrom & Associates, Ltd., Rochelle Anderson and Susan Vinge.*

14219686v1